# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

  vs.                                              CR No. 16-2011 WJ

TRISTIN ROBERT BEGAY,

## MEMORANDUM OPINION AND ORDER GRANTING GOVERNMENT'S MOTION IN LIMINE PURSUANT FED.R.EVID. 803(2) AND 803(4)

THIS MATTER comes before the Court upon the Government's Motion in Limine to Permit Testimony Regarding Victim's Statements Pursuant to Fed.R.Evid. 803(2) and 803(4), filed May 7, 2018 **(Doc. 85)**. In this motion, the Government seeks a pre-trial ruling permitting testimony from the victim's (Jane Doe) family and her boyfriend as to statements she made on the night of the alleged rape while she was leaving Defendant's residence. The Government also seeks a pre-trial ruling permitting testimony from Patrick Ignacio, M.D., regarding the victim's statements during the victim's sexual assault exam. Having reviewed the parties' pleadings and the applicable law, the Court finds that the Government's motion is well-taken and, therefore, is granted.

### BACKGROUND

Defendant is charged in a two-count indictment with sexual abuse and aggravated sexual abuse of his then seventeen-year-old second cousin, Jane Doe, which allegedly occurred on May 29, 2014 at Defendant's residence in his bedroom. The parties emphasize different aspects of the event, with the Defendant offering more of the facts relating to the alleged sexual

assault itself. At the time of the offense, Shanette Begay (Defendant's mother), Olivia Charleston (Jane Doe's mother), O'Bryan Charleston (Jane Doe's brother), and Summer Hall (O'Bryan's girlfriend) were all present in the home.

The facts presented by the Government describe the statements at issue as well as the facts occurring after the alleged sexual assault.

After the assault (according to the Government's brief), Jane Doe went to the bathroom and texted her then boyfriend, Darrell Maldonado. Jane Doe and Darrell texted for approximately 30 minutes. Jane Doe told Darrell that Defendant "just violated [her.]" They discussed what to do next. Over the course of the conversation, Jane Doe described the sexual assault to Darrell as follows:

> I fell asleep watching a movie and he was on the floor. next thing i woke up and he's fingering me And on top of me . . . I don't know why I didn't try to fight him off. I told him to stop . . . He took off my pants and started fingering me then I was awake. He got on top and put it in. I didn't know what to do. While he was doing this "I said what are you doing? Stop."

During this conversation, Jane Doe was obviously distressed. She told Darrell that she did not know what to do, that she was embarrassed, that she "wan[ed] to cry" but couldn't "feel anything." Darrell encouraged Jane Doe to tell her mother about the assault. Around midnight, Jane Doe woke up her mother Olivia, and told her that Defendant raped her. Jane Doe started crying and told Olivia she was afraid to say anything. After hearing what happened, Olivia immediately went to Defendant's mother, Shanette Begay, woke her up, and told her what happened. Together Olivia, Shanette, and Jane Doe woke up and confronted Defendant. During this confrontation, Jane Doe was screaming, crying, and very upset.

The noise from the confrontation woke up Jane Doe's brother, O'Bryan, and his girlfriend, Summer Hall, who were sleeping in the living room. Summer heard Jane Doe

2

screaming at Defendant: "Why would you do this to me?! You have a girlfriend. What do you think your girlfriend is going to think?"

Jane Doe told O'Bryan and Summer about the rape. She said that she was sleeping in the bed when she felt something weird and woke up to Defendant touching her. Jane Doe told O'Bryan and Summer that she tried to tell Defendant to stop, but he did not. As she explained what happened, she was crying and said she wanted to leave the home.

After the confrontation, Jane Doe and her family quickly gathered their belongings and left Defendant's residence. The family traveled to a nearby law enforcement officer's home and reported the rape. According to Navajo Nation police records, the report was called in at approximately 12:43 a.m.

Defendant's brief includes facts pertaining to the alleged assault itself:

On the night of the incident (and according to Defendant), Jane Doe intentionally slept in the same bed as Defendant, who was her eighteen year-old cousin, as she had done many times previously. On the night of the incident, she went into Defendant's room so she could charge her iPod, as there were no other locations in the home offering that capability). The offense occurred in Defendant's bedroom sometime between 10:30 p.m. and 11:30 p.m. while Jane Doe's relatives were sleeping. Jane Doe began charging her iPod in Defendant's room at 10:00 p.m. They began to watch T.V. and ultimately she fell asleep. Jane Doe stated that she woke up to the feel of someone touching her and at first she thought it was her boyfriend who was spending the night at his home in Window Rock, AZ. She claimed that the touching led to her being vaginally penetrated by Mr. Begay's fingers and ultimately Mr. Begay removed her pants, her underwear and his own shorts before penetrating her vaginally with his penis. Jane Doe claims that Mr. Begay pinned her down and penetrated her while periodically removing his penis and

masturbating himself and then penetrated her again. At no time during the alleged sexual assault did Jane Doe cry for help to any of the numerous family members within earshot of her alleged sexual assault. In fact, Jane Doe explained initially that she did not wish to scream for help because she was afraid it might "scare" the other people in the house.

After the alleged sexual assault, Defendant went to the restroom and Jane Doe got up, put her clothes on and bot back in bed. Defendant returned and fell asleep next to Jane Doe. Jane Doe got up at around 11:00 p.m., went to the bathroom and started texting her boyfriend; the text messaging went on for thirty minutes to an hour. Afterwards, Jane Doe woke up her mother, and then the two of them woke up Defendant's mother.

The Government seeks a ruling permitting statements from Jane Doe's family and her boyfriend as to statements Jane Doe made on the night of the alleged rape.

In the early hours of that same night of May 30, 2017, Jane Doe underwent a sexual assault exam by Patrick Ignacio, MD. As part of his examination, Dr. Ignacio obtained a patient narrative from Jane Doe. During the narrative, Jane Doe explained that her cousin forced himself on her and overpowered her. Jane Doe told Dr. Ignacio that the assault began with Defendant putting his fingers into her vagina. Defendant then "pinned" her legs down with his Legs and inserted his penis into her vagina. The Government also seeks a ruling permitting testimony from Dr. Ignacio regarding the victim's statements during the victim's sexual assault exam.

## DISCUSSION

Hearsay is not admissible except as provided by the Rules of Evidence. Fed.R.Evid. 802.

## I. Rule 803(2)-Excited Utterance

Federal Rule of Evidence 803(2) provides an exception to the general rule of exclusion

4

for excited utterances. An excited utterance is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed.R.Evid. 803(2).

A. Relevant Law and Parties' Positions

The excited-utterance exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event. *United States v. Ledford*, 443 F.3d 702, 710 (10th Cir. 2005). The Government contends that Jane Doe's extemporaneous statements to her boyfriend and her family are classic examples of excited utterances in that the sexual assault of Jane Doe is the startling event; she made statements made to her boyfriend Darrell and her family while still experiencing the shock and distress of the assault, within a two hour time period immediately following the assault; and finally, the statements were about the assault that had just taken place, which satisfies the nexus requirement. *See United States v. Frost*, 684 F.3d 963, 973 (10th Cir. 2012) (statements qualifies as excited utterances where victim was still crying and visibly upset*); United States v. Smith*, 606 F.3d 1270, 1280 (10th Cir. 2010) (rape victim's statements to neighbor immediately following the rape, "Help me, help me. He raped me" were admissible as excited utterances where the victim was still under obvious stress).

Defendant contends that the statements at issue do not qualify as an excited utterance under the hearsay exception in Rule 803(2). Defendant also distinguishes the *Frost* case in that the question there was not the admissibility or non-admissibility of the hearsay statements; rather, the question was whether the court's admission of the statements was in clear error in light of the fact there was no objection from defendant. The Tenth Circuit found that it was not.

5

Defendant argues that the first factor (a startling event) is not met. While a sexual assault would normally qualify as a startling event, there is a question as to whether Jane Doe as the seventeen year-old declarant, experienced a sexual assault or was at all startled. Defendant points out that she intentionally slept in Defendant's bed that night, as she had on previous occasions; she was aware that other family members were well within ear shot of her cries for help through the thin walls, but she claimed she decided not to cry for help during the alleged assault for fear that she would "scare" the others sleeping in the home. This decision belies a finding that she was in an excited state of mind. Jane Doe's conduct is also inconsistent with a finding that she was startled by the event, since instead of leaving the bedroom for the safety of her older brother and his girlfriend who were sleeping in the next room just a few feet away, she put her clothes back on and returned to Defendant's bed. After a while, she began "to feel bad" about what happened. She texted her boyfriend about the incident in the bathroom for an hour while Defendant was sleeping in the bedroom. Defendant contends that this is not the behavior or someone who experienced a startling event.

In contrast, the victim's statements in *Frost* were made to her sister *immediately* after the rape. The court in *Frost* found that two startling events had occurred: the victim was raped, and she was kicked out of the house by the defendant's family. Defendant argues that in this case, Jane Doe began texting her boyfriend, and did not make any statements to any of the family members until after she already conversed with her boyfriend for almost an hour. Thus, any statements she made to her family were not made during the excitement of a startling event. Defendant's position is that the temporal proximity between the alleged sexual assault and her statements to her family is too distant to come under the exception. *Cmp. United States v. Frost*, 684 F.3d 963, 974 (10th Cir. 2012), *overruled on other grds. by United States v. Bustamante-*

*Conchas*, 850 F.3d 1130 (10th Cir. 2017) (in determining whether statements to police are admissible as excited utterances, courts have looked to two primary factors: spontaneity of the statement, and level of excitement).

Defendant contends that second prong (that the statement was made while the declarant was under the stress of the event's excitement) is not met either, because merely being upset is not sufficient. *See Frost,* 684 F.3d at 975 (statements made after a clear opportunity for reflection, even if entirely voluntary, may be inadmissible); *see, e.g., Winzer v. Hall*, 494 F.3d 1192, 1200 (9th Cir. 2007) ("If [declarant] was able to calmly and coolly call 911 several hours after the threat and discuss both the threat and other circumstances, she must have weighed the costs of intrusion against the benefit of obtaining help from the police.")." After the alleged sexual assault in this case, Jane Doe was sufficiently unstartled and unexcited by the event that she laid in bed with her alleged rapist when she had the opportunity to leave and in fact dressed and got back into bed with Defendant.

Defendant concedes that if the Court finds that the Government has met the first two prongs required by the test, the third prong (nexus between content of statement and event) would be met. However, Defendant excludes from this concession her statements to Defendant pointing out that he has a girlfriend and "what would his girlfriend think about this." Defendant contends that these statements meet none of the prongs for Rule 803(2) because these statements are not related to the event.

B. <u>Analysis</u>

There is a fatal flaw with Defendant's argument here because it subjects the facts relating to Jane Doe's conduct to a credibility assessment, which is not part of a Rule 803(2) analysis. Defendant concedes that sexual assault would "normally qualify as a startling event." Doc. 100

7

at 3. However, Defendant claims that there is a question as to whether Jane Doe experienced a sexual assault or was at all startled. He contends that because Jane Doe frequently slept in the same bed with Defendant and because Defendant had taken her shirt off during a previous encounter in which they were sleeping together, the alleged sexual assault cannot be considered a "startling event." This approach begs the question and indeed, the entire reason this case is being prosecuted. The first factor is met because of the very nature of the alleged event. Whether a sexual assault *actually* occurred or whether there was consent cannot be resolved in this analysis.

The second factor (statement made while declarant was under stress of the event's excitement) is also satisfied. Defendant emphasizes the length of time Jane Doe spent texting her boyfriend Darrell and to a "distant" temporal proximity between the incident and the statements she made to her family, but Rule 803(2) contains no time limit except the requirement that the statement was made while the declarant was under stress of the event's excitement. It is entirely plausible that the stress from a sexual assault could last through the time in which Jane Doe made her statements to her boyfriend and to her family. She went to tell her mother about the assault, and then her brother and his girlfriend, and the statements in themselves indicate obvious stress by the declarant. To be sure, aspects of Jane Doe's behavior are somewhat problematic, such as her decision to get back into bed with Defendant after the sexual assault and not to seek immediate help, but whether Jane Doe's demeanor was feigned or exaggerated is, again, an issue of credibility and this is an issue defense counsel is free to explore on cross-examination. It would be inappropriate (as well as reversible error) for the Court to make factual findings that interpret the facts at this point. Whether Jane Doe is credible is for the jury to decide after all the evidence is in and the victim's testimony can be assessed and weighed by the jury.

The third factor is also satisfied, and Defendant concedes as much. The Court does not agree with Defendant that Jane Doe's statements to Defendant about his girlfriend finding out about the incident should be excluded because they are not related to the sexual assault. In fact, the statements are very much related—it is only because the alleged sexual assault occurred that this statement was made in the first place.

Therefore, the Government's motion seeking a ruling to permit these statements under Fed.R.Evid. 803(2) is granted.

## II.     Rule 803(4)

Federal Rule of Evidence 803(4) allows admission of statements made for medical treatment. Rule 803(4) provides that a statement that "describes medical history; past or present symptoms or sensations; their inception; or their general cause" is admissible when that statement is "made for — and. . . reasonably pertinent to — medical diagnosis or treatment." Fed.R.Evid. 803(4). The Supreme Court has noted that "statements made in the course of receiving medical care . . . are made in contexts that provide substantial guarantees of their trustworthiness." *United States v. Joe*, 8 F.3d 1488, 1494 (10th Cir. 1993) (citing *White v. Illinois,* 502 U.S. 346 (1992). It is well-settled that Rule 803(4) allows the introduction of statements to medical professionals regarding whether, when, where, and how a sexual assault occurred. *See United States v. Frost*, 684 F.3d 963, 976 (10th Cir. 2012) ("Details regarding whether, where, and how A.W. was touched are pertinent to medical diagnosis in a sexual assault case.").

The Government contends that in this case, the details of the assault, including the identity of the alleged perpetrator, were pertinent to this case. The Government also claims that the admission of these statements will not violate Defendant's rights under the Confrontation

Clause because they were non-testimonial, and moreover, Jane Doe will be available at trial for cross examination by defense counsel. *See Crawford v. Washington,* 541 U.S. 36 (2004) (out-of-court statements by witnesses that are *testimonial* are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses).

Defendant has no objection to Dr. Ignacio testifying as to Jane Doe's statements made to him during his medical exam pursuant to Fed.R.Evid. 803(4), and thus the Government's motion for a ruling to permit these statements under this rule is granted.

**THEREFORE,**

**IT IS ORDERED** that the Court upon the Government's Motion in Limine to Permit Testimony Regarding Victim's Statements Pursuant to Fed.R.Evid. 803(2) and 803(4) **(Doc. 85)** is hereby GRANTED for the above stated reasons.

_____
CHIEF UNITED STATES DISTRICT JUDGE